[No. 9632.  Department Two.  May 25, 1912.]

THE STATE OF WASHINGTON, *on the Relation of Paul Polson,*
*Plaintiff and Appellant,* v. RICHARD E. HARDCASTLE
*et al., Defendants and Appellants.*[1]

MUNICIPAL CORPORATIONS — FISCAL MANAGEMENT — FUNDS—STATUTES—CONSTRUCTION.  The act of 1897, page 222 (Rem. & Bal. Code, § 5129 *et seq.*), creating in all cities of less than twenty thousand inhabitants a current "expense fund" and an "indebtedness fund," supplanted former laws requiring moneys from the same sources to be paid into the "general fund."

CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS.  Where municipal indebtedness was incurred at a time when the law required all moneys received from licenses, fines, etc., to be paid into the general fund, and available to meet the indebtedness, it would be an impairment of the obligation of the contract to divert such revenue into a current expense fund, without making any provision for revenue to pay the past indebtedness.

SAME—WARRANTS—WRONGFUL DIVERSION OF REVENUE—DEFENSES.  A city's wrongful diversion to the current expense fund of revenue belonging to the indebtedness fund cannot be justified on the ground of necessity and that all funds diverted were needed to meet disbursements and save the existence of the city, where it appears that the city for years failed to make the maximum tax levies authorized by law to be made for either of such funds.

MANDAMUS—WHEN LIES—TO CITY OFFICERS.  Mandamus lies to compel a city to levy and collect the maximum tax for its indebtedness fund and to pay into such fund the revenue belonging thereto, where for years it had wrongfully diverted the revenue belonging to such fund and made no provision for the payment of its past indebtedness.

MUNICIPAL CORPORATIONS — WARRANTS — ORDER OF PAYMENT—ACTIONS—RELIEF.  Under Rem. & Bal. Code, § 3947, requiring city warrants to be paid in the order of their issuance, the holder of warrants suing to compel the city to provide funds for their payment cannot acquire any preference over other prior warrants of the same class, although the holders thereof had not made any efforts to obtain like relief.

Cross-appeals from a judgment of the superior court for
Skagit county, Joiner, J., entered October 26, 1910, upon

[1] Reported in 124 Pac. 110.

findings after a trial to the court, in proceedings to mandamus city officers. Modified.

*J. L. Corrigan,* for plaintiff.

*Thos. Smith, Frank Quinby,* and *C. D. Beagle,* for defendants.

Crow, J.—The relator, Paul Polson, as assignee, is owner and holder of two general fund warrants of Anacortes, a city of the third class; one for $449.50, dated June 13, 1892, and one for $450.50, dated July 18, 1892. These warrants were presented to the city treasurer and by him indorsed "Not paid for want of funds." They are still unpaid, and bear interest from the date of their presentation at the rate of ten per cent per annum. On April 29, 1910, the relator commenced this action in the superior court of Skagit county, for a writ of mandamus, directed to the treasurer, mayor, and council of the city. In his affidavit he alleged that he was the owner and holder of the warrants; that they were unpaid; that the general fund upon which they were drawn was created by general statute of the state of Washington, in force prior to and at the time of their issuance, which statute then provided that all moneys received from licenses, street poll-tax, fines, penalties, and forfeitures should be paid into the general fund, and also provided that the proceeds of a tax levy on all property within the municipality not exceeding sixty cents on each $100 should also be paid into the general fund; that in 1898 the municipal officers created an expense fund into which they diverted all revenues from licenses, poll taxes, fines, penalties, and forfeitures, and also a portion of the taxes levied which should have been placed in the general fund; that they claimed authority for such diversion under chapter 84, Laws of 1897, p. 222 (Rem. & Bal. Code, §5129 *et seq.*) ; that the last mentioned act, in so far as it attempted to authorize such diversion, was, as to relator's warrants,

unconstitutional and void as an impairment of the obligation of contracts; that relator had no knowledge of such diversion prior to September 1, 1908; that, if the city had paid into the general fund all moneys that should have been so paid, relator's warrants would have been long since paid; that the respondent Richard E. Hardcastle, as city treasurer, has in his possession funds available for the payment of relator's warrants; that relator has demanded their payment which has been refused, and that he has no plain, speedy, or adequate remedy at law except through the issuance of a writ of mandamus. Relator therefore prayed that a writ might issue commanding the city treasurer to pay his warrants, and that, in the event they could not be paid at once, the mayor and city councilmen be commanded to levy a tax upon all property of the municipality for the purpose of raising funds with which to make payment. Evidence introduced upon the trial was sufficient to sustain these allegations. The trial court properly found:

"That the city of Anacortes has diverted large sums of money which should have been paid into the general fund, and has diverted from said general fund large sums of money which were derived by the said city of Anacortes from liquor licenses, poll tax, fines and penalties and that the amount of revenue derived from this source so diverted prior to June 1st, 1910, if it had been applied to the payment of warrants drawn upon the general fund, would have been more than sufficient to have paid all warrants prior to those held by the relator, and would have left an amount sufficient to have paid relator's warrants in full. . . . That there are outstanding general fund warrants, which warrants were issued and presented for payment prior to the time relator's warrants were issued and presented, in an amount approximating thirty thousand dollars ($30,000), and accumulated interest. That no suit, action or other proceeding has been brought by the holders of said warrants previously issued, or any of them, to compel the city authorities to properly administer its revenues."

Upon the findings thus made, it was adjudged that a per-

emptory writ issue, (1) commanding the mayor and city councilmen to levy and collect an annual tax of six mills to be paid into the general fund, and to continue the levy of such taxes until relator's warrants should be paid; (2) commanding the city treasurer and his successors to pay into the general fund all moneys derived from liquor licenses, poll-tax, fines, penalties, and forfeitures, until relator's warrants shall be paid, and (3) commanding the city treasurer to pay the relator $140.40, from the current expense fund, the same to be indorsed upon his warrants. From this decree, the respondents have appealed. The relator has also appealed.

As these are cross-appeals, we will allude to the parties as relator and respondents, as they were known in the trial court. In addition to the findings made, the relator requested the following findings, which, upon the evidence, we conclude should also have been made:

"That since January 1st, 1910, there has come into the hands of the respondent, Hardcastle, as treasurer, a sum in excess of three thousand six hundred ($3,600) dollars, which sum was derived from the payment of liquor licenses, issued by the said city of Anacortes since January 1st, 1910. That said sum would be more than sufficient to pay the full amount of principal and interest due upon relator's warrants.

"That said sum of three thousand six hundred ($3,600) dollars was paid into the current expense fund by said Hardcastle and was used by him for the purpose of paying current expense fund warrants which had been issued during the years 1909 and 1910."

Upon these requested findings and those made, relator asked a peremptory writ commanding the city treasurer to pay his warrants out of the moneys coming into the current expense fund. This request seems to have been made on the theory that, as large sums of money belonging to the general fund had been wrongfully diverted to the current expense fund to relator's prejudice, and as such money would have been sufficient to pay relator's warrants, and as relator

had produced evidence in this action sufficient to show such wrongful diversion, he was entitled to have his warrants paid out of the current expense fund. Sections 636 and 647 of Hill's Annotated Statutes and Codes read as follows:

"Sec. 636. The city council of such city have power, . . .

"(9) To levy and collect annually a property tax, which shall be apportioned as follows: *For the general fund, not exceeding sixty cents on each one hundred dollars;* for street fund, not exceeding thirty cents on each one hundred dollars; and for sewer fund, not exceeding ten cents on each one hundred dollars. The levy for all purposes for any one year shall not exceed one dollar on each one hundred dollars of the assessed value of all real and personal property within such city."

"Sec. 647. Nothing in this chapter contained shall be construed to prevent any city having a bonded indebtedness, contracted under laws heretofore passed, from levying and collecting such taxes for the payment of such indebtedness, and the interest thereon, as are provided for in such laws, in addition to the taxes herein authorized to be levied and collected. *All moneys received from licenses, street poll-tax, and from fines, penalties, and forfeitures, shall be paid into the general fund.*"

These statutes were in force at the date of the issuance of relator's warrants and entered into the contracts which they evidenced. Sections 1, 2, and 3 of "An act relative to taxes and funds of municipal corporations having less than twenty thousand inhabitants," chapter 84, p. 222, Laws of 1897 (Rem. & Bal. Code, § 5129 *et seq.*), read as follows:

"Section 1. In all municipal corporations, having less than twenty thousand inhabitants, there shall be maintained a fund to be designated as 'current expense fund,' and, after the first day of February, eighteen hundred and ninety-eight, a fund to be designated as 'indebtedness fund.'

"Sec. 2. All moneys collected by such corporations from licenses for the sale of intoxicating liquors and from all other licenses shall be credited and applied by the treasurer to said 'current expense fund': *Provided,* that this act shall not exempt such corporations from paying ten per cent of all money collected for liquor licenses, to the state.

"Sec. 3.  Such municipal corporations shall levy and collect annually a property tax for the payment of current expenses, not exceeding ten mills on the dollar; *a tax for the payment of indebtedness (if any indebtedness exists) not exceeding six mills on the dollar*, and all moneys collected from the taxes levied for payment of current expenses shall be credited and applied by the treasurer to 'current expense fund'; and all moneys collected from the taxes levied for payment of indebtedness shall be credited and applied to a fund to be designated as 'indebtedness fund.'"

It is manifest from the entire act of 1897 that the fund to be known as the indebtedness fund supplanted the original general fund, and that all existing warrants were to be paid therefrom.  At the time the act of 1897 was passed, relator held his unpaid warrants, which were payable out of the general fund created and maintained under laws then in force, which pledged and devoted to their payment all moneys received from licenses, street poll-tax, fines, penalties and forfeitures.  He now contends that, as to his warrants, the act of 1897 which authorized a diversion to the new current expense fund of all moneys arising from licenses for the sale of intoxicating liquors and from other licenses prior to the payment of his warrants was unconstitutional, as an impairment of the obligation of contracts.

This contention, which was upheld by the trial court, is not seriously disputed by the respondents; but they contend the diversion should be sustained on the ground of necessity, as they insist the evidence shows that all licenses and other receipts thus diverted were needed to meet disbursements nonpayment of which would have jeopardized the life and existence of the city, and that it was therefore the duty of the municipal officers to thus divert the funds in order that they might save the existence of the corporation.  It was not satisfactorily shown that expenses which the city had thus paid were *all* necessary to its continued existence.  The only evidence on that point was a general verbal statement of the city treasurer that estimates made by the city council from

year to year exceeded the total levies actually made or that could have been made for current expenses. No detailed showing was furnished disclosing the character of the disbursements from the current expense fund. It does appear that the city council failed to make a maximum levy of six mills for the general or indebtedness fund authorized by the act of 1897. The following levies for that fund were made: In 1898, one mill; in 1903, two mills; in 1900, 1901, 1902, and 1909, three mills; in 1899, 1904, 1905, 1906, and 1907, four mills; while in 1908 no levy was made for the indebtedness fund. For the current expense fund, the following levies were made: In 1899, six mills; in 1900, 1901, 1902, and 1909, seven mills; in 1903 and 1906, eight mills; in 1898, nine mills; and in 1904, 1905, 1907, and 1908, ten mills. During all these years, the maximum levies of ten mills for the current expense fund and six mills for the indebtedness fund were authorized by the act of 1897. It will be noticed that, in eight of the years mentioned, the council failed to make the maximum levy of ten mills for the current expense fund to preserve the endangered life of the city, and that they endeavored to maintain its life by diverting to that fund not only the licenses mentioned in the act of 1897, but also poll taxes, fines, penalties, and forfeitures not mentioned in section 2 of that act. Not only did they thus divert funds that should have been applied to the payment of the old warrant indebtedness created prior to 1897, but they continually neglected to make the maximum levy of six mills authorized by the act of 1897 for the indebtedness fund. The record clearly shows that the respondents are in no position to excuse their actions on the ground of necessity to save the life of the city, for they practically abandoned the general fund now known as indebtedness fund by failing to make maximum levies of six mills, and at the same time diverted to the current expense fund a total of over $80,000 which, with taxes actually paid into the indebtedness fund, would have been more than sufficient to reach and pay relator's warrants

in the order of their issuance.  In no single year since 1897
have the combined levies for the current expense and indebted-
ness funds reached the maximum limit of sixteen mills author-
ized by law.  It is manifest that, if these levies had been
made and no license receipts had been wrongfully diverted,
the city officials could not only have paid relator's warrants
and all prior warrants, but that they could also have met all
expenditures which would have been a necessary charge on
the current expense fund.  This it was their duty to do if
necessary to pay the indebtedness of the city and preserve
its existence.  In *Eidemiller v. Tacoma*, 14 Wash. 376, 44
Pac. 877, this court said:

"It is not the duty even if it be the privilege, of the holder
of a warrant, to compel the city to place money in the treas-
ury.  That is the duty of the city.  The law gives the creditor
the right to have his warrant paid according to its number,
date, and issue, out of moneys which are in the treasury.
His right to an action commences then, and he has a right
to invoke the law for the protection of his interest in such
moneys, and to prevent them from being diverted from their
proper channel, or from being applied to the payment of
claims subsequent to his, and to his injury; and before the
city can be heard, as an excuse for the repudiation in any
degree of any just debt, to urge the plea of 'necessity of
existence,' it must show that it has availed itself to the fullest
possible extent of all its privileges under the law, and has
put forth all the efforts necessary to perpetuate its existence
under the conditions imposed by the law of paying its honest
obligations in compliance with the provisions of law.  When
such a case is presented, it will be time to discuss the grave
questions involved in the propositions of 'corporate neces-
sity,' and the preservation of 'corporate existence.' "

The act of 1897 clearly indicates an intention to accom-
plish two results; (1) to create and maintain a fund to pay
all outstanding indebtedness, and (2) to create and maintain
a current expense fund to meet such expenditures as might
be necessary to maintain the corporation and continue its
existence.  Instead of making maximum levies to pay its
debts and meet expenses, as it was authorized to do, the

city of Anacortes has made only partial levies and has endeavored to meet its running expenses by the diversion of funds which should have been appropriated to the discharge of its old indebtedness. The result is that relator's warrants, which might have been paid years since, are still unpaid, and are drawing interest at the high rate of ten per cent per annum. No such methods can meet with judicial approval. We think that all controlling legal questions involved in this action have in effect been passed upon in *Eidemiller v. Tacoma, supra,* and that the doctrines there announced entitle the relator to the relief awarded by the trial judge, save and except that portion thereof which commands the city treasurer to pay from the current expense fund the sum of $140.40 upon his warrants. The record shows that, from January 1 to May 1, 1910, funds more than sufficient to pay relator's warrants received by the city from licenses, fines, penalties, and forfeitures, were wrongfully diverted to the current expense fund; that the relator has been wronged by the continual unlawful acts of the city; that had the city officials performed their duties according to law, his warrants would have been paid, and that no other warrant holder has proceeded against the city. The relator, therefore, contends that he should be first entitled to enjoy the fruits of this litigation by having his warrants paid from the current expense fund to which such receipts have been unlawfully diverted, and that such payment should be made forthwith even though prior general fund warrants are still outstanding and unpaid. This contention cannot be sustained. Section 3947, Rem. & Bal. Code, directs that:

"All county, school, city and town warrants shall be paid according to their number, date and issue, and shall draw interest from and after their presentation to the proper treasurer: Provided, that no compound interest shall be paid directly or indirectly on any of said warrants."

Were this an action in equity, the relator's contention, in the absence of the statute above quoted, might appeal to the

conscience of the chancellor.  Relator, however, has applied for a writ of mandamus to compel a maximum levy of six mills for the indebtedness fund, and also to compel payment to that fund of all receipts for licenses, poll taxes, fines, penalties, and forfeitures, until his warrants are paid.  He cannot seek equitable relief, nor can such relief be granted in violation of statutes upon which his rights depend.  His warrants will have to be paid in their regular order from the indebtedness fund.

"When a judgment is recovered against the municipality on a warrant, the judgment as a general rule does not alter or destroy the priority of the holder of the warrant, or of the holders of other warrants on the fund.  The remedies incident to the debt are carried into the judgment and are not lost or destroyed by merger and, on the other hand, the rendition of the judgment does not entitle the judgment creditor to any priority over warrants which are by law entitled to prior payment."  2 Dillon, Municipal Corporations (5th ed.), § 854.

The judgment of the superior court will be affirmed to the extent of directing that a writ of mandamus issue, (1) commanding the mayor and city councilmen to levy and collect an annual tax of six mills, to be paid into the general indebtedness fund, and to continue such annual levy until the relator's warrants shall be paid, and (2) commanding the city treasurer and his successors to pay into the general or indebtedness fund all moneys derived from liquor licenses, poll taxes, fines, penalties, and forfeitures, until relator's warrants shall be paid.  The relator will recover his costs in the superior court, and on appeal in this court.

DUNBAR, C. J., MOUNT, MORRIS, and CHADWICK, JJ., concur.